

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>v. )<br>)<br>THE L.E. MYERS COMPANY, )<br>Defendant. ) | No. 02 CR 1205<br><br>Magistrate Judge Geraldine Soat Brown |

## MEMORANDUM OPINION AND ORDER

On May 19, 2005, a jury found defendant the L.E. Myers Company ("Myers") guilty on one count and not guilty on another count of the Indictment. [Dkt 121.] On June 20, 2005, Myers moved pursuant to Fed. R. Crim. P. 33 for a new trial. (Def.'s Mot. for New Trial). [Dkt 125.] For the reasons set our herein, and after careful consideration of the issues and the evidence at trial, Myers' motion for a new trial is denied.

## BACKGROUND

This case arose from two incidents that occurred while Myers was engaged in the repair and maintenance of high voltage power transmission lines. The indictment charged that Myers violated certain regulations promulgated by the Secretary of Labor pursuant to the Occupational Safety and Health Act ("OSHA"), causing the deaths by electrocution of Blake Lane and Wade Cumpston, two Myers employees. Blake Lane died on December 28, 1999 while working on a tower in Mt. Prospect, Illinois. Wade Cumpston died on March 25, 2000 while working on a tower in Plainfield, Illinois. The jury found Myers guilty of willfully violating five regulations promulgated pursuant to

OSHA, causing Blake Lane's death, but found Myers not guilty with respect to Wade Cumpston's death.[1]

In its motion, Myers raises four arguments for a new trial: (1) that the court erred in giving the conscious avoidance or "ostrich" instruction; (2) that the court's admission (for the government) and exclusion (for Myers) of "energized static wire" evidence was error; (3) that improper references to punishment require a new trial; and (4) that the court erred in its instruction regarding "corporate knowledge."

## DISCUSSION

Fed. R. Crim. P. 33(a) provides in relevant part: "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." The district court has broad discretion in deciding whether to grant a new trial. *U.S. v. Reed*, 875 F.2d 107, 113 (7th Cir. 1989); *U.S. v. Allied Asphalt Paving Co.*, 451 F. Supp. 804, 816 (N.D. Ill. 1978). A new trial may be granted when required by the interests of justice, which has been interpreted to mean that substantial rights of the defendant have been jeopardized by errors or omissions during trial. *U.S. v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989); *see also U.S. v. Eberhart*, 388 F.3d 1043, 1048 (7th Cir. 2004). "A jury verdict in a criminal case is not to be overturned lightly, and therefore a Rule 33 motion is not to be granted lightly." *U.S. v. Morales*, 902 F.2d 604, 605 (7th Cir. 1990); *see also Eberhart*, 388 F.3d at 1048. However, if the judge believes there is a serious danger that a

---

[1] Specifically, Myers was found guilty of violating the following regulations: (1) 29 C.F.R. § 1910.269(a)(2)(i) or § 1910.269(a)(2)(ii) (the training rules); (2) 29 C.F.R. § 1910.269(a)(3) (determining existing conditions); (3) 29 C.F.R. § 1910.269(c) (pre-job briefing); (4) 29 C.F.R. § 1910.269(l)(1) (requirement that employee be qualified); and (5) 29 C.F.R. § 1910.269(l)(2) (minimum safe approach distance).

miscarriage of justice has occurred, the judge has the power to set the verdict aside. *Morales*, 902 F.2d at 605.

## I.    Conscious Avoidance Instruction

Myers argues that the court erred in giving the conscious avoidance or "ostrich" instruction to the jury at the government's request and over Myers' objection. Myers asserts that, given the nature of the evidence at trial regarding the issues of knowledge and willfulness, the giving of the ostrich instruction cannot be said to be harmless and warrants granting a new trial. (Def.'s Mot. at 6.)

The jury was instructed that, in order to find Myers guilty, it must find that Myers "willfully" violated OSHA. (Jury Instructions Given at 14, 15.) [Dkt 112.] It was also instructed that:

> A violation of an OSHA regulation or safety standard is willful *if the employer has actual knowledge that its actions did not comply with the regulation or standard,* and the employer intentionally disregarded the requirements of the regulation or standard or was deliberately indifferent to those requirements. The employer need not have acted maliciously or specifically intended to harm its employees.

(*Id.* at 26, emphasis added.)  In addition, the jury was given the "ostrich" instruction based on Seventh Circuit Pattern Criminal Jury Instruction No. 4.06:

> You may infer knowledge from a combination of suspicion and indifference to the truth. If you find that a person had a strong suspicion that things were not what they seemed or that someone had withheld some important facts, yet shut his eyes for fear of what he would learn, you may conclude that he acted knowingly, as I have used that word. You may not conclude that the person had knowledge if he was merely negligent in not discovering the truth.

(*Id.* at 27.)

Thus, the jury was instructed that guilt required actual knowledge. In addition, as part of the ostrich instruction, the jury was instructed that it could not find Myers had knowledge if Myers was

3

merely negligent in discovering the truth. Accordingly, there was no risk of diluting the standard of "willfulness" to a lesser standard of constructive knowledge, which was the error leading to reversal in *U.S. v. Ladish Malting Co.*, 135 F.3d 484, 490, 491 (7th Cir. 1998).

Myers did not deny that it had actual knowledge of the OSHA regulations and standards. However, it denied that it had actual knowledge that its actions did not comply with those standards and regulations. An ostrich instruction informs the jury that actual knowledge and deliberate avoidance of knowledge are the same thing. *U.S. v. Inglese*, 282 F.3d 528, 537 (7th Cir. 2002). An ostrich instruction is appropriately given when: (1) the defendant claims a lack of guilty knowledge; and (2) the facts and evidence support an inference of deliberate ignorance. *U.S. v. Fallon*, 348 F.3d 248, 253 (7th Cir. 2003). Deliberate ignorance or avoidance "may be established by overt, physical acts as well as by 'purely psychological avoidance, a cutting off of one's normal curiosity by an effort of will.'" *U.S. v. Craig*, 178 F.3d 891, 896 (7th Cir. 1999) (quotation omitted). Deliberate ignorance may also be established by the failure to ask questions in a situation where suspicious circumstances might warrant questions. *See U.S. v. Wilson*, 134 F.3d 855, 868 (7th Cir. 1998).

Myers argues that the ostrich instruction is designed for situations where there is some "on-going criminal venture" as to which the defendant deliberately shut his eyes, citing *U.S. v. Giovannetti*, 919 F.2d 1223 (7th Cir. 1990) (illegal gambling enterprise); *U.S. v. Caliendo*, 910 F.2d 429 (7th Cir. 1990) (prostitution ring); *U.S. v. Jaffe*, 387 F.3d 677, 681 (7th Cir. 2004) (scheme to defraud mortgage lender); *U.S. v. Gonzalez*, 319 F.3d 291 (7th Cir. 2003) (conspiracy to distribute drugs); *U.S. v. Trigg*, 119 F.3d 493, 504 (7th Cir. 1997) (conspiracy to sell stolen merchandise); *U.S. v. Draves*, 103 F.3d 1328, 1333 (7th Cir. 1997) (aiding and abetting the use of fraudulently obtained credit cards); and *U.S. v. Nobles*, 69 F.3d 172, 185 (7th Cir. 1995) (possession of drugs). (Def.'s

Mot. at 4.) In this case, Myers' underlying activity – maintenance of electrical power lines – is not itself illegal. However, there is no reason why conscious avoidance cannot lead to an inference of knowledge in the context of enforcement of OSHA, as it can in the enforcement of other criminal statutes. In *Ladish Malting*, the Seventh Circuit suggested the appropriateness of an ostrich instruction in a criminal OSHA case.[2]

In this case there was evidence that one or more Myers' employees either actually knew that they were not complying with OSHA regulations or deliberately ignored facts and circumstances showing that they had not complied.

Among the regulations that the jury found Myers had violated were regulations requiring Myers to determine existing conditions on the work site before starting work on or near electrical lines, and to conduct at least one pre-job briefing and additional briefings if the work changed.[3] The

---

[2] Myers correctly observes that an ostrich instruction was not requested in the *Ladish Malting* case. However, in that case the Seventh Circuit interpreted OSHA's willfulness requirement as a synonym for knowing, and continued, "Knowledge may be proved by showing deliberate indifference to the facts or the law, . . . or by showing awareness of a significant risk coupled with steps to avoid additional information, as with an ostrich instruction . . . ." 135 F.3d at 490.

[3] 29 C.F.R. § 1910.269(a)(3) provides:

Existing conditions related to the safety of the work to be performed shall be determined before work on or near electric lines or equipment is started. Such conditions include, but are not limited to, the nominal voltages of lines and equipment, the maximum switching transient voltages, the presence of hazardous induced voltages, the presence and condition of protective grounds and equipment grounding conductors, the condition of poles, environmental conditions relative to safety, and the locations of circuits and equipment, including power and communication lines and fire protective signaling circuits.

29 C.F.R. § 1910.269(c)(1) provides:

The employer shall ensure that the employee in charge conducts a job briefing with the employees involved before they start each job. The briefing shall cover at least the following subjects: hazards associated with the job, work procedures involved, special precautions,

5

evidence in connection with the Mt. Prospect incident in which Blake Lane died (for which Myers was found guilty) showed that Lane, a new apprentice, was killed when he came in contact with the energized static line on the west side of a transmission tower. After working without incident on a "static" line on the east side of the tower, Lane was directed by Darrin West, Myers' foreman, to move over to the west side to check on the line there. The west line was energized and not grounded, and Lane was killed. There was an insulator on the tower in proximity to the west line, which was an indication that the static line on that side was energized and not grounded to the tower. There was evidence that the insulator was large enough to be visible from the ground. Darrin West testified that this was the first time he had worked in Chicago. He testified that he had had no training about working in a major metropolitan area. He admitted that he received a work order before starting the work, and that he did not read it. He used the work order only to obtain the materials needed for the job, and did not see that it specified that work was to be done on both sides of the tower. He admitted that he gave Lane no information about the west side of the tower, and did not determine that the line on the west side was energized. West and Lane had climbed the tower to work on the east side, and West was in the process of lowering tools down when he ordered Lane over to the west side. West did not see the insulator from his location. He also admitted that, under OSHA regulations, a line is to be presumed energized, unless demonstrated not to be.

---

energy source controls, and personal protective equipment requirements.

(1) Number of briefings. If the work or operations to be performed during the work day or shift are repetitive and similar, at least one job briefing shall be conducted before the start of the first job of each day or shift. Additional job briefings shall be held if significant changes, which might affect the safety of the employees, occur during the course of the work.

West admitted being aware of OSHA regulations requiring a pre-job briefing and determining existing conditions. The existence of an insulator was notice that the static line on the west side was energized. The insulator was visible from the ground, but West did not look at the west tower before climbing the tower to start the work, and thus failed to determine the existing condition of the wire on the west side before starting the work. Because he had not looked at the work order, he was expecting to work only on the east side. When he ordered Blake Lane to the west side, he did not hold an additional pre-job meeting to see if the safety conditions of the work had changed. From that evidence, the jury could properly conclude that West either actually knew that he had not complied with the OSHA regulations or that he was deliberately avoiding knowing that he did not comply with them.

The ostrich instruction was also justified by evidence relating to the Plainfield incident in which Wade Cumpston was killed. The fact that Myers was acquitted on that Count confirms that the jury was not confused by the instruction into lowering the government's burden of proof. Michael Young, a lineman at the Plainfield site, testified that some of Myers' grounding equipment at the Plainfield site had the wrong clamp end for working on a tower, and that grounding cables were too short, making the space for working smaller. He claimed that those problems had been discussed with Clifton Gooch, Myers' foreman at the Plainfield site. However, during his testimony, Gooch wavered about whether he had actual knowledge of hazardous conditions at the Plainfield site, at one point testifying that he had no concerns about the safety of his crew before the accident and that the equipment was proper, but also testifying that he knew the crew was using 2-aught grounds when they should have had 4-aught grounds. That evidence supported an argument that

Gooch either knew, or deliberately avoided knowing, that the work at the Plainfield site was not properly grounded in compliance with OSHA regulations.[4]

Finally, even if giving an ostrich instruction was error, that error was harmless. A defendant is entitled to a new trial based on an erroneous jury instruction if the instruction did not adequately state the law and the error was prejudicial to the defendant because the jury was likely to be confused or misled. *Boyd v. Illinois State Police*, 384 F.3d 888, 894 (7th Cir. 2004). There was ample evidence that Myers' employees, including Darin West, knew that they were violating OSHA regulations, including the three other regulations that the jury found Myers had violated as well as the two regulations discussed in detail above, in connection with the work on the Mt. Prospect tower.

Myers' motion for a new trial on this basis is denied.

## II. "Energized Static Wire" Evidence

Myers argues that the court erroneously admitted evidence favoring the government and erroneously excluded evidence favoring Myers that would have been used to rebut the government's evidence. (Def.'s Mot. at 7-13.)

### A. Government Exhibit 23

Myers objected to the admission of Government Exhibit 23, a map of northern Illinois by

---

[4] Myers was charged in Count II with violating 29 C.F.R. § 1910.269(n)(3), which provides, in relevant part:

> Equipotential Zone. Temporary protective grounds shall be placed at such locations and arranged in such a manner as to prevent each employee from being exposed to hazardous differences in electrical potential.

8

Commonwealth Edison Company ("ComEd") showing the location of transmission towers that, like the Mt. Prospect tower involved in Lane's death, had so-called "static" lines that were energized to provide power for lighting, primarily around airports. Myers argues that the map could not have been relevant because Myers did not know about it.

Myers' work on the Mt. Prospect tower was pursuant to a "blanket" contract with ComEd for overhead transmission facility maintenance as and where required, anywhere on ComEd's property from December 1999 until May 1, 2000. (Govt. Ex. 25 at T194, T200, T233.) The contract stated that Myers had been asked to bid on the work in part because Myers was experienced in handling ComEd projects. (*Id.* at T231.) The government presented evidence that the map had been prepared in 1997, prior to Lane's death, and was available to ComEd contractors like Myers. Under the applicable OSHA regulations, it was Myers' responsibility to determine existing conditions on the work site before beginning work. The map was a piece of information about existing conditions that was available to Myers, an experienced contractor that had bid on and obtained a contract to do maintenance work on any part of ComEd's transmission system. There was no evidence that Myers had requested the map and been refused. The map also illustrated that in 1997 more than a few of the towers on which Myers had contracted to work had energized lines. Thus, the map met the standard of relevance under Fed. R. Evid. 401.

## B.    Myers' argument that exculpatory evidence was excluded

Myers claims that it was prejudiced by the exclusion of evidence supporting its theory that an energized static wire is a "unique hazard" created by ComEd, and therefore, Myers' failure to discover that hazard on its own could not be a violation of the OSHA regulations. (Def.'s Mot. at

9

8, 12.) That evidence, Myers argues, would have rebutted the government's suggestion, supported by the ComEd map, that energized static wires are not unusual. (*Id.*) Myers cites to two pieces of evidence.

First, Myers sought to admit into evidence the document attached as Exhibit 2 to its motion for a new trial. (Tr. May 17, 2005, p.m. at 2-6.) That document is a memorandum dated September 24, 1979 by an OSHA hearing officer regarding an OSHA investigation following the death of a ComEd employee who was killed while working on an energized static wire. Although Myers characterizes the document as an agreement between OSHA and ComEd, it is in fact a memorandum by the OSHA hearing officer apparently summarizing certain interviews with company and union officials, including a closing conference. The document includes the following:

> During the closing conference, stated that all cited items were adequately abated. Recommended the use of warning signs on the towers with energized static lines, not for the employee's protection because the current procedures adequately covers them, but primarily for contractors that may be hired. Mr. Olney stated they did not want the employees to depend on signs. As for contractors, a company foreman would be detailed to accompany the contractors on any job. My only reply was they be sure to follow their procedures and that their foreman be aware of the procedures established. Stated that if the penalties had been paid the case may be closed when I return and report.

(Def.'s Mot. Ex. 2 at 2.)

Myers argues that the document reflects an agreement between OSHA and ComEd "that ComEd would be required to implement procedures to warn workers and third parties of [the hazard of energized static lines]." (Def.'s Mot. at 8.) However, there is no executed agreement, order or directive. The author does not characterize the activity as an agreement or requirement, noting that his "only reply" was that ComEd should follow its procedures, and then closing the case upon the payment of penalties.

At trial, Myers suggested that the document was not hearsay because it is an admission by OSHA that energized static lines are hazardous. (Tr. May 17, 2005 p.m. at 4.) However, "government agents are not party-opponents for purposes of Rule 801(d)(2)." *U.S. v. Arroyo*, 406 F.3d 881, 888 (7th Cir. 2005); *see also U.S. v. Prevatte*, 16 F.3d 767, 779 n. 9 (7th Cir. 1994) (stating that no individual can bind the sovereign). Furthermore, it was never disputed that energized lines are hazardous. The issue was whether Myers willfully failed to determine the existence of that hazard.

Second, Myers argues that it was precluded from obtaining information relevant to the defense because the court quashed a subpoena that Myers served upon ComEd during the course of the trial. Myers cites specifically to an affidavit by a former ComEd employee and union official, Norman Willey, attached to its motion for a new trial.[5] In that affidavit, Willey states that following the 1979 fatality, ComEd implemented measures to prevent similar accidents in the future, specifically, creating a color-coded map, providing a map to its foreman in the field, and having a ComEd foreman accompany any contractor and its crews working near energized static wires. (Def.'s Mot. Ex. 3 ¶ 7.) Willey's affidavit does not say how long ComEd continued those procedures.

Myers did not learn of the 1979 fatality as a result of the trial in this case, because there was no evidence regarding that event presented at trial. Although Myers states that it did not serve its subpoenas on OSHA or ComEd until Government Exhibit 23 was admitted, Myers was apparently aware of the 1979 fatality without the use of any trial subpoenas. *See* Def.'s Mot. at 9-10. Myers'

---

[5] Myers also speculates that there might be "perhaps additional direct evidence," but does not suggest what that additional evidence might be. (Def.'s Mot. at 11.)

motion states that it was able to locate Mr. Willey upon conducting further investigation without process. (Def.'s Mot. at 11.)

The admission of that evidence would not have changed the outcome of the case. In fact, had evidence of the 1979 fatality been admitted, the government would likely have argued that the death of an employee working on ComEd's energized static lines would have been known in the industry among contractors like Myers who worked on ComEd lines, and should have made Myers, who got the 1999 ComEd contract by representing that it was experienced in working on ComEd lines, aware of the hazard. *See U.S. v. Redditt*, 381 F.3d 597, 601 (7th Cir. 2004) (a defendant is entitled to a new trial based on an erroneous evidentiary ruling only if the error had "a substantial and injurious effect or influence on the jury's verdict") (quotation omitted). If the evidence against a defendant is otherwise overwhelming, any evidentiary error is deemed harmless and cannot constitute the basis for a new trial. *Id.*

Myers had an obligation to determine the existing condition in 1999 of the site on which its employees, including Blake Lane, were to work. Whether or not twenty years earlier ComEd had agreed to procedures regarding energized lines does not relieve Myers of that responsibility. The evidence showed that Darrin West climbed the tower to begin the work without even looking at the west side of the tower, where the presence of the insulator would have alerted him to the risk of an energized un-grounded line. The evidence showed that when West ordered Blake Lane to move to the west side of the tower, where West had not expected to work because he had not read the work order, he did not hold another pre-job meeting to determine if there was increased risk. There was no evidence that Myers was relying on any of the procedures discussed in Willey's affidavit.

Myers' motion for a new trial on this ground is denied.

12

## III. Reference to Punishment

Prior to opening statements, as part of the preliminary instructions to the jury, the court told the jury that Myers was charged with violating a section of OSHA, 29 U.S.C. § 666(e), and read the relevant portion of the statute.[6] (Tr. May 5, 2005 a.m. at 5-6.) Neither party objected when the statute was read. However, because the single sentence of the statute contains both the nature of the crime and a reference to punishment, it was error to read it, an error for which the court and not the government is responsible. During its opening statement, the government attempted to deal with the court's error by stating that a corporation and not an individual was on trial. (Tr. May 5, 2005 a.m. at 47.) Myers' counsel then objected and a sidebar conference was held. (*Id.* at 47-48.)

During the sidebar conference, Myers' counsel stated that Myers was "going to make a motion for a mistrial." (*Id.* at 48.) The court suggested that perhaps a mistrial should be declared because of the court's mistake, and a new jury selected. (*Id.* at 54.) Myers' counsel then backed off his request for a mistrial, stating, "[M]y main issue is how the Court will instruct this jury. And if we're in agreement on the instruction, then there may not be a basis for a mistrial." (*Id.* at 54-55.) The court reiterated that if there was going to be a mistrial based on this error, it was better to declare it immediately and start over. (*Id.* at 56.) Myers' counsel agreed that the problem could be corrected

---

[6] That portion states:

Any employer who willfully violates any standard, rule, or order promulgated pursuant to section 655 of this title, or of any regulations prescribed pursuant to this chapter, and that violation caused death to any employee, shall, upon conviction, be punished by a fine of not more than $10,000 or by imprisonment for not more than six months, or by both; except that if the conviction is for a violation committed after a first conviction of such person, punishment shall be by a fine of not more than $20,000 or by imprisonment for not more than one year, or by both.

29 U.S.C. § 666(e).

13

with an appropriate instruction. (*Id.*) Rather than pursuing a mistrial, both Myers and the government assisted the court in drafting an instruction to be read to the jury. (*Id.* at 55-58.) The parties agreed to a curative instruction to be read to the jury. (*Id.* at 57-58.) Myers' counsel agreed that it would be a proper cure, stating: "If that's the instruction, I would say that's the proper cure, Judge." (*Id.* at 58.)

The curative instruction was read immediately after the sidebar.[7] There was no subsequent objection, and the government continued its opening statement. At the end of the opening statements, outside the presence of the jury, the court inquired about the curative instruction:

> Court: Let me ask counsel for the government and the defense, is there any issue now remaining regarding the earlier controversy and the possible motion for a mistrial?
>
> Myers' counsel: Based upon the Court's curative instruction there is no motion from the defense at this time.

(*Id.* at 66.)

Myers now argues that it is entitled to a new trial, attempting to turn the court's error in reading the punishment portion of the statute into a prosecutorial misconduct issue. (Def.'s Mot. at

---

[7] The agreed curative instruction stated:

Ladies and gentleman, this disruption, unfortunately, I have to take responsibility for that myself. And the colloquy that occurred between the lawyers, the objections and so on that you heard that took place, are as a result of the fact that when I was reading to you earlier in the instructions the description of the statute under which the defendant is charged, a certain portion of it was not correct as applies to a corporation. Therefore, I am instructing you to put that completely out of your mind. And I am reminding you that in connection with this case your only duty is to determine whether the government proves that the crime charged in the indictment is proof beyond a reasonable doubt. You are not in any way to consider the issue of punishment or sentencing in any respect and disregard anything that I may have said regarding punishment or sentencing altogether. Put that out of your mind.

(Tr. May 5, 2005 a.m. at 59-60.)

13-19.) That is not the case. The transcripts do not support Myers' argument that the government improperly referred to punishment during its opening statements. Likewise, Myers is not correct in arguing that the court's willingness to consider a mistrial was based on prosecutorial misconduct during opening statement. The court's consideration of a mistrial was based on the court's own error in reading the statute, particularly in light of Myers' concern that the amount of the fine read to the jury understated Myers' potential punishment. (Tr. May 5, 2005 a.m. at 54.)

In a criminal case, "the practice of informing juries about the sentencing consequences of their verdicts is strongly disfavored," and "courts should withhold information about punishment from the jury because the jury's role is typically restricted to deciding whether the defendant is guilty of the crime charged." *Aliwoli v. Carter*, 225 F.3d 826, 830 (7th Cir. 2000) (quotations and citations omitted). However, if an inappropriate comment is made in the presence of the jury, the court must determine whether the comment caused sufficient prejudice so as to deprive the defendant of due process. *Id.*

Here, the parties assisted in crafting a curative instruction that was immediately read to the jury. *See U.S. v. Robbins*, 197 F.3d 829, 836 (7th Cir. 1999) (errors that are the subject of curative instructions are presumed harmless). Myers agreed that the instruction resolved the problem. There is no basis to believe that this error, which occurred on the first of seven days of testimony and was dealt with promptly, deprived Myers of a fair trial.

Myers' motion for a new trial on this basis is denied.

## IV. Corporate Knowledge Instruction

Myers argues that the court erred in instructing the jury that the knowledge obtained by an

15

employee is imputed to the corporation when it concerns a matter within the scope of the employee's employment. (Def.'s Mot. at 19-20.) Rather, Myers asserts that not only must the information concern a matter within the scope of employment, but the employee must also have some responsibility to act on that information for it to be deemed "corporate knowledge." (*Id.* at 20.)

With regard to "corporate knowledge," the jury was instructed as follows:

> In deciding whether the defendant corporation acted knowingly, you must consider that a corporation can act only through its employees and agents. Accordingly, knowledge obtained by the corporation's employees acting within the scope of their employment that concerns a matter within the scope of their employment is knowledge possessed by the corporation. Once a corporation acquires that knowledge, it remains with the corporation even if the employee is no longer employed by the corporation, if the knowledge is of continuing importance to the business of the corporation.

(Jury Instructions Given at 28.) The jury was also instructed regarding the meaning of "scope of employment":

> For an act to be within the authority of an agent or the scope of the employment of an employee, it must deal with a matter whose performance is generally entrusted to the agent or employee by L.E. Myers Company.

(*Id.* at 24.)

Myers argues that the corporate knowledge instruction was prejudicial because it allowed the jury to consider evidence, admitted over Myers' objection, regarding "a routine, brief and uneventful job" performed by a Myers crew in 1970 on the same static wire as the one worked on in 1999 that resulted in Lane's death. (Def.'s Mot. at 21; Def.'s Reply at 9-10.) Myers concludes that the instruction allowed the jury to conclude that the corporation "knew" about the hazard of "energized static wires" simply because it was a "matter within the scope of the 1970 crew's employment."

(Def.'s Mot. at 22.)[8]

As discussed above, a defendant is entitled to a new trial if the instruction did not adequately state the law and the error was prejudicial to the defendant because the jury was likely to be confused or misled. *Boyd*, 384 F.3d at 894. All of the instructions must be read together to determine if the jury was properly instructed. *U.S. v. Smith*, 415 F.3d 682, 688, 689 (7th Cir. 2005).

Myers cites *Juarez v. Ameritech Mobile Comm., Inc.*, 957 F.2d 317, 321 (7th Cir. 1992), a Title VII sexual harassment case, to support its contention that knowledge is imputed to a corporation only if the agent had a duty to speak with respect to the specific item of knowledge. (Def.'s Mot. at 20.)[9] In that case, the knowledge of a supervisor in the accounts payable department was not imputed to the company because, although the supervisor was technically in a managerial position, she was not part of the Human Relations Department and did not supervise the employee accused of harassment. *Juarez*, 957 F.2d at 321. Thus, the supervisor's knowledge did not concern a matter within the scope of her authority. *Id.*

Where a matter is within the scope of employment or agency, the law presumes that the employee will report the knowledge to the corporate principal:

> To distinguish knowledge belonging exclusively to an agent from knowledge belonging to the corporate principal, courts rely on certain presumptions. Where a corporate agent obtains knowledge while acting in the scope of his agency, he presumably reports that knowledge to his corporate principal so the court imputes

---

[8] Myers subsequently acknowledged that "[t]here is no basis to believe that the jury's verdict was a result of that isolated piece of evidence." (Def.'s Mot. Based on Newly-Discovered OSHA Evidence at 8 n. 1.) [Dkt 132.]

[9] Myers also cites *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 446 (7th Cir. 1994), also involving a sexual harassment claim, but *Doe* simply cites the *Juarez* decision. As the opinion states, the plaintiff in *Doe* did not establish a sufficient record regarding which agents of the employer had received what knowledge. *Id.* at 447-48.

17

such knowledge to a corporation. However, where an agent obtains knowledge while acting outside the scope of his agency, the standard presumption is unfounded, and the court will not impute the agent's knowledge to the corporation.

*U.S. v. One Parcel of Land*, 965 F.2d 311, 316 (7th Cir. 1992).

In the evidence discussed by Myers, the Myers' employees working on the line in 1970 were working within the scope of their employment in a matter that Myers had entrusted to them. The condition of that line was information that would affect the way they performed that work. Likewise, the information about the existing conditions acquired by other Myers' employees as they were working for Myers at the site where Lane was killed was information that could be attributed to Myers.

The corporate knowledge instruction also instructed the jury about how long corporate knowledge is presumed to remain with the corporation. Knowledge imputed to the corporation remains with the corporation even if the employee is no longer employed by the corporation, where the facts are of continuing importance to the business of the corporation. *Acme Precision Prod., Inc., v. American Alloys Corp.*, 422 F.2d 1395, 1398 (8th Cir. 1970); *Caterpillar Inc. v. OSHRC*, 122 F.3d 437, 440 (7th Cir. 1997).

Thus, Myers' motion for a new trial on this ground is denied.

## CONCLUSION

For the foregoing reasons, Myers' motion for a new trial is denied.

IT IS SO ORDERED.

*Geraldine Soat Brown*
Geraldine Soat Brown
United States Magistrate Judge

November 2, 2005

18